BRYAN, Judge.
 

 The defendants below, George G. Spottswood and Amy H. Spottswood, appeal a judgment insofar as it (1) determined the location of the boundary line separating the Spottswoods’ riparian rights in Mobile Bay from those of the plaintiffs below, Henry E. Reimer, Sr.; Daniel E. Reimer, Sr.; Regina R. Ehlert; and Melanie R. Moore (collectively referred to as “the Reimers”); and (2) determined the location where the Spottswoods could build a pier. The Reimers cross-appeal the judgment insofar as it (1) determined the location of a disputed segment of the upland boundary line separating the coterminous parcels of land owned by the Reimers and the Spottswoods and (2) determined the ownership of a triangular gore of land claimed by both the Reimers and the Spottswoods. We affirm in part and reverse in part.
 

 
 *790
 
 The Reimers and the Spottswoods own coterminous lots located along the eastern shore of Mobile Bay approximately one mile south of the Grand Hotel at Point Clear. The Reimer lot is located south of the Spottswood lot.
 

 The Reimers and the Spottswoods dispute the location of the westernmost segment of the upland boundary line separating their lots (“the disputed segment of the upland boundary line”); they do not dispute the location of the remainder of their upland boundary line (“the undisputed segment of the upland boundary line”). The Reimers contend that the entire upland boundary line separating their lot from the Spottswood lot is a continuous straight line running westward from Scenic Highway 98 on a bearing of South 89 degrees, 21 minutes, 44 seconds West until it intersects with the high-tide line of Mobile Bay. Thus, according to the Reimers, the correct location of the disputed segment of the upland boundary line is a straight line that begins at the western terminus of the undisputed segment of the upland boundary line and runs on a bearing of South 89 degrees, 21 minutes, 44 seconds West until it intersects with the high-tide line of Mobile Bay. We will refer to the line that the Reimers contend is the correct location of the disputed segment of the upland boundary line as “the Reimer line.” According to a survey performed by Geo Surveying (“the Geo survey”), which the trial court found contains an accurate depiction of the Reimer line, the Reimer line is 50.84 feet long. A copy of the Geo survey is attached to this opinion as an appendix.
 

 The Spottswoods, on the other hand, contend that the correct location of the disputed segment of the upland boundary line is a straight line that begins at the western terminus of the undisputed segment of the upland boundary line and thence runs southwestward on a bearing of South 62 degrees, 26 minutes, 50 seconds West until it intersects with the high-tide line of Mobile Bay. We will refer to the line the Spottswoods contend is the correct location of the disputed segment of the upland boundary line as “the Spottswood line.” According to the Geo survey, which the trial court found contains an accurate depiction of the Spottswood line, the Spottswood line is 29.42 feet long.
 

 The Reimer line and the Spottswood line form two sides of a triangle (“the triangle”). The third side of the triangle is a line that begins at the western terminus of the Reimer line and runs generally southeastward along the high-tide line of Mobile Bay to the western terminus of the Spotts-wood line. According to the Geo survey, which the trial court found contains an accurate depiction of the third side of the triangle, the third side of the triangle is 27.7 feet long.
 

 According to the Geo survey, the western terminus of the northern boundary of the Spottswood lot, which is not in dispute in this appeal, is located on the high-tide line of Mobile Bay at a point that is 21.2 feet northwest of the western terminus of the Reimer line and 48.9 feet northwest of the western terminus of the Spottswood line. According to the Geo survey, the western terminus of the southern boundary of the Reimer lot, which is not in dispute in this appeal, is located on the high-tide line of Mobile Bay at a point that is 89 feet southeast of the western terminus of the Reimer line and 61.3 feet southeast of the western terminus of the Spotts-wood line.
 

 The Reimers claim that they own the triangle because, they say, they own record title to it. The Spottswoods claim that they own the triangle under two alternative theories. First, they argue that they own it because, they say, it is land that has been created by natural accretion since the
 
 *791
 
 legal descriptions describing the Reimer lot and the Spottswood lot were originally written and the rule governing the apportionment of land that naturally accretes in front of the land of coterminous landowners mandates that the Spottswoods should be awarded the entire triangle in order to maintain the proportionate share of the bay frontage their lot had before the accretion occurred. Second, they argue that they own the triangle because, they say, their predecessors in title acquired it by adverse possession.
 

 The Reimers and the Spottswoods also dispute the location of the boundary line separating their riparian rights in Mobile Bay (“the riparian boundary line”). The Spottswoods contend that the riparian boundary line runs perpendicular to the shoreline of Mobile Bay from the western terminus of the upland boundary line separating the Reimer lot from the Spotts-wood lot while the Reimers contend that it runs on the same bearing as that upland boundary line. The Reimers contend that establishing the riparian boundary line perpendicular to the shoreline would be inequitable because it would establish the riparian boundary line south of a substantial portion of the wooden pier extending from the Reimers’ lot into Mobile Bay (“the Reimer pier”), a pier that the Reim-ers built in the 1950s and have maintained in the same location ever since.
 

 Finally, the parties dispute whether the location where the Spottswoods can build a pier within the boundaries of their riparian rights should be restricted. The Reimers contend that, if the Spottswood line is determined to be the correct location of the disputed segment of the upland boundary line, then the Spottswoods should be restricted to building a pier in the “footprint” of the pier that existed on the Spottswood lot when they bought it in 2005 (“the Demouy pier”). The Spottswoods, on the other hand, contend that, subject to harbor and pier lines established by the United States or the State of Alabama, they are entitled to build a pier anywhere within their riparian boundaries so long as it does not unreasonably obstruct navigation.
 

 The Reimers have owned their lot since the 1940s. The legal description contained in their deed was originally written in 1899. That legal description describes the upland boundary line between the Reimer lot and the Spottswood lot as a straight line beginning at Scenic Highway 98 and from thence running a distance of 11.5 chains, which is 759 feet, to Mobile Bay. The distance from Scenic Highway 98 to Mobile Bay at the location of the boundary line described in the legal description of the Reimer deed is now substantially more than 759 feet. The legal description contained in the Reimers’ deed indicates that their lot had a.frontage on Mobile Bay of 61.5 feet in 1899. The Reimer pier, which extends over 100 feet into Mobile Bay, and the shoreline of Mobile Bay located north of it form an acute angle.
 

 The Spottswoods bought their lot in March 2005 from the Demouy family. The Demouy family bought the lot in 1967. The deed conveying the lot to the Demouy family in 1967 and the deed conveying the lot to the Spottswoods in March 2005 contain legal descriptions describing the frontage of the lot on Mobile Bay as being 56.53 feet and the upland boundary line separating the lot now owned by the Spottswoods from the Reimer lot as being a straight line running from the approximate high-tide line of Mobile Bay on a bearing of North 89 degrees, 48 minutes East an unspecified distance to the “Northwest corner of the Reimer fence, thence continuing North 89 degrees 48 minutes East along the fence dividing the property herein described from the property of Reimer
 
 *792
 
 ... a distance of 653.73 feet, more or less, to a point on the Westerly line of [Scenic Highway 98].”
 

 In 1967, when the Demouy family bought the lot now owned by the Spotts-woods, the Demouy pier was already in existence. It began in the yard of the house located on the lot and extended over 100 feet into Mobile Bay. A portion of the Demouy pier passed through the triangle, and the Demouy family cleaned and maintained the portions of the triangle situated south and north of the Demouy pier and stored boats and other items on the portion of the triangle situated south of the Demouy pier. Although the Demouys made repairs to the Demouy pier over the years, they never changed its location.
 

 In 1998, the Reimers applied to the Army Corps of Engineers for a permit to enlarge the boathouse on the Reimer pier. They attached a drawing drawn by Henry E. Reimer, Sr., to their application. Although it is not drawn to scale, the drawing states that the Reimer lot has a frontage on Mobile Bay of 61.5 feet and depicts the Demouy pier as being located well north of the upland boundary line between the Reimer lot and the lot the Demouys later sold to the Spottswoods. It also indicates that the existing boathouse on the Reimer pier was located 15 feet south of the pavilion on the Demouy pier and that the proposed enlargement of the boathouse would reduce the distance between the boathouse on the Reimer pier and the pavilion on the Demouy pier to 12 feet.
 

 Both the Reimer pier and the Demouy pier were damaged by Hurricane Ivan in 2004. After the Spottswoods bought their lot from the Demouys in March 2005, they removed the remaining structure of the Demouy pier (although its “footprint” is still visible in aerial photographs) and began making preparations to build a new pier (“the proposed Spottswood pier”) to the south of the location of the Demouy pier. The Reimers objected to the proposed Spottswood pier because, they said, it would block their view of the sunset and the Grand Hotel at certain times. The Reimers’ concerns about the proposed Spottswood pier prompted the Reimers to have a survey performed, which, in turn, led to the parties’ disputes regarding the location of the disputed segment of the upland boundary line and the ownership of the triangle.
 

 In June 2005, the Reimers sued the Spottswoods, seeking a determination that the Reimer line constituted the correct location of the disputed segment of the upland boundary line. The Spottswoods answered the Reimers’ complaint and asserted a counterclaim in which they sought a determination that the Spottswood line constituted the location of the disputed segment of the upland boundary line, a determination that the Spottswoods owned the triangle by virtue of adverse possession, a determination that they owned the triangle by virtue of the rule governing the apportionment of land that has accreted naturally in front of land owned by coterminous landowners, a determination regarding the location of the boundary line separating their riparian rights in Mobile Bay from those of the Reimers, and a determination regarding the location where they could build the proposed Spottswood pier.
 

 Following a bench trial at which it received evidence ore tenus, the trial court entered a judgment in which it (1) determined that natural accretion had occurred since the legal descriptions of the Reimer lot and the Spottswood lot were originally written, which had created the triangle and shifted the high-tide line of Mobile Bay to the west; (2) determined that, under the rule governing the apportionment of naturally accreted land between coter
 
 *793
 
 minous landowners, the entire triangle should be awarded to the Spottswoods; (B) determined that, even if the Spottswoods were not entitled to ownership of the triangle by virtue of the rule governing the apportionment of naturally accreted land between coterminous landowners, they had established that their predecessors in title had acquired ownership of the triangle by adverse possession; (4) determined that, because the Spottswoods owned the triangle, the Spottswood line was the correct location of the disputed segment of the upland boundary line between the Spotts-wood lot and the Reimer lot; (5) determined that, in order to do equity, the riparian boundary line should extend from the shoreline on the same bearing as the Spottswood line rather than on a bearing that was perpendicular to the shoreline; and (6) determined that the location of the proposed Spottswood pier should be restricted to the footprint of the Demouy pier. Following the filing of postjudgment motions, the trial court initially set aside its judgment, then later reinstated its judgment. Thereafter, the parties again filed postjudgment motions. After those postjudgment motions were denied by operation of law, the Spottswoods timely appealed to the supreme court, and the Reimers timely cross-appealed. The supreme court then transferred the appeal and the cross-appeal to this court pursuant to § 12-2-7(6), Ala.Code 1975.
 

 Because the trial court received evidence ore tenus, the following principles govern our review:
 

 “ ‘ “ ‘[W]hen a trial court hears ore tenus testimony, its findings on disputed facts are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust.’ ” ’
 
 Water Works & Sanitary Sewer Bd. v. Parks,
 
 977 So.2d 440, 448 (Ala.2007) (quoting
 
 Fadalla v. Fadalla,
 
 929 So.2d 429, 433 (Ala.2005), quoting in turn
 
 Philpot v. State,
 
 843 So.2d 122, 125 (Ala. 2002)). ‘ “The presumption of correctness, however, is rebuttable and may be overcome where there is insufficient evidence presented to the trial court to sustain its judgment.” ’
 
 Wattman v. Rowell,
 
 913 So.2d 1083, 1086 (Ala.2005) (quoting
 
 Dennis v. Dobbs,
 
 474 So.2d 77, 79 (Ala.1985)). ‘Additionally, the ore tenus rule does not extend to cloak with a presumption of correctness a trial judge’s conclusions of law or the incorrect application of law to the facts.’
 
 Waltman v. Rowell,
 
 913 So.2d at 1086.”
 

 Retail Developers of Alabama, LLC v. East Gadsden Golf Club, Inc.,
 
 985 So.2d 924, 929 (Ala.2007).
 

 The Reimers’ cross-appeal challenges the determinations of the trial court regarding the parties’ upland rights while the Spottswoods’ appeal challenges the trial court’s determinations regarding the parties’ riparian rights. Because the parties’ riparian rights depend upon their upland rights,
 
 see Mobile Docks Co. v. City of Mobile,
 
 146 Ala. 198, 207, 40 So. 205, 208 (1906) (stating that riparian rights are “in the nature of an easement” and “have their origin in, and are dependent upon, the ownership of the upland, contiguous to and attingent on the water, and attached to and are appurtenant to the upland, and not to the soil under the water”), we will address the Reimers’ cross-appeal first.
 

 The Reimers argue that the trial court erred in finding that the triangle was created by accretion; erred in determining that the Spottswoods own the triangle under the rule governing the apportionment of naturally accreted land between coterminous landowners; and erred in determining that, if the triangle was not accreted land, the Spottswoods nonetheless owned the triangle because their predeces-
 

 
 *794
 
 sors in title had acquired it by virtue of adverse possession. We cannot overturn a trial court’s finding regarding a disputed issue of fact unless that finding is so unsupported by the evidence as to be plainly and palpably erroneous.
 
 See, e.g., Dennis v. Dobbs,
 
 474 So.2d 77, 79 (Ala.1985) (“It is the policy of this court to presume correct the findings of the trial court based upon competent evidence, when the evidence is presented
 
 ore tenus.
 
 Such findings will not be disturbed upon appeal if supported by the evidence or any reasonable inference therefrom, unless they are plainly and palpably erroneous and manifestly unjust.
 
 First Alabama Bank of Montgomery v. Coker,
 
 408 So.2d 510 (Ala.1982);
 
 Knapp v. Knapp,
 
 392 So.2d 527 (Ala.1980). The presumption of correctness, however, is rebuttable and may be overcome where there is insufficient evidence presented to the trial court to sustain its judgment.
 
 First Alabama Bank of Montgomery v. Coker, supra.”).
 
 Marshal Demouy, a member of the Demouy family, which had owned the lot now owned by the Spotts-woods from 1967 to 2005, testified that, as a result of natural accretion, the shoreline of Mobile Bay in front of the lot his family owned from 1967 to 2005 was now approximately 30 to 50 feet further west than it had been in 1967. Jeff Demouy, Marshal Demouy’s son, also testified that natural accretion had occurred, although he estimated that the accretion had shifted the shoreline of the bay 20 to 30 feet westward rather than 30 to 50 feet. Survey evidence indicated that, in 2005, the distance between Scenic Highway 98 and the high-tide line of Mobile Bay in the location of the undisputed segment of the upland boundary line was at least 50 feet greater than 759 feet, the distance it was stated to be in the legal description of the Reimer lot, which was originally written in 1899. On the other hand, several witnesses proffered by the Reimers testified that no accretion had occurred since the 1950s and that the portion of the shoreline of Mobile Bay located in front of the Reimer and Spottswood lots was in essentially the same place it had been located in the 1950s. Thus, the evidence regarding whether the triangle was created by accretion was in dispute. In such a situation, the following principles apply:
 

 “In ore tenus proceedings, the trial court is the sole judge of the facts and of the credibility of witnesses, and the trial court should accept only that testimony it considers to be worthy of belief.
 
 Ostrander v. Ostrander,
 
 517 So.2d 3 (Ala. Civ.App.1987). Further, in determining the weight to be accorded to the testimony of any witness, the trial court may consider the demeanor of the witness and the witness’s apparent candor or evasiveness.
 
 Ostrander, supra
 
 .... It is not the province of this court to override the trial court’s observations.
 
 Brown
 
 [
 
 v. Brown,
 
 586 So.2d 919 (Ala. Civ.App.1991) ].”
 

 Woods
 
 v. Woods,
 
 653 So.2d 312, 314 (Ala. Civ.App.1994). Because the testimony of Marshal Demouy and some of the survey evidence support the trial court’s factual finding that the triangle was created by natural accretion, we cannot overturn that factual finding.
 
 See Retail Developers of Alabama, LLC v. East Gadsden Golf Club, Inc.,
 
 supra;
 
 Dennis v. Dobbs,
 
 supra; and Woods
 
 v. Woods,
 
 supra.
 

 The Reimers also argue that, even if the triangle is accreted land, the legal description of their lot is written in such a way that the triangle should be deemed to fall within that legal description. In pertinent part, the legal description of the Reimers’ lot describes the upland boundary line separating the Reimer lot from the Spottswood lot as running from Scenic Highway 98 a distance of 11.5 chains “to Mobile Bay.” The Reimers ar
 
 *795
 
 gue that, even if 11.5 chains (759 feet) measured from Scenic Highway 98 now falls short of Mobile Bay, the portion of the legal description describing the boundary line as running “to Mobile Bay” should be accorded preference over the stated measurement of 11.5 chains. In support of this argument, the Reimers cite cases such as
 
 Grubbs v. Crosson,
 
 634 So.2d 593 (Ala. Civ.App.1994), in which this court stated the order of preference with regard to references in a deed used to establish a boundary line: “References to natural monuments prevail over references to artificial landmarks; references to artificial landmarks prevail over references to course and distance.”
 
 Id.
 
 at 595.
 

 However, the Reimers have not cited any legal authority holding that the order of preference stated in
 
 Grubbs v. Crosson
 
 applies when the location of the natural monument referred to in the deed has shifted due to natural accretion. In the absence of a such authority, we conclude that, because the trial court found that the triangle was land created by natural accretion, the ownership of the triangle must be determined by the rule governing the apportionment of land created by natural accretion in front of land owned by coterminous landowners rather than the rule giving a preference to a reference to a natural monument in a legal description.
 

 The Reimers also argue that, even if the triangle is accreted land, Alabama caselaw has held that accreted land belongs to the owner of the land in front of which the accreted land is situated. In support of this argument, the Reimers cite
 
 Reid v. State,
 
 373 So.2d 1071 (Ala.1979), and
 
 State v. Gill,
 
 259 Ala. 177, 66 So.2d 141 (1953).
 

 In
 
 State v. Gill,
 
 the State of Alabama brought an action seeking a determination that it owned land that had been created by artificial accretion in front of a parcel of land that had fronted on Mobile Bay before the United States had created the accreted land by dredging. The trial court held that Gill was entitled to the artificially accreted land created by the dredging on the part of the United States, and the State appealed to the Alabama Supreme Court. Citing the principle that a riparian owner is entitled to artificial accretions to his or her land caused by a third party, the supreme court affirmed the trial court’s determination that the artificially accreted land in front of Gill’s parcel belonged to him rather than the State.
 

 In
 
 Reid v. State,
 
 the State of Alabama brought an action seeking a determination that it owned accreted land that had been created by artificial means in front of two adjacent parcels of land, one owned by Vivian E. Reid and Roberta C. Reid and the other owned by Robin C. Herndon III and T.C. Weller, Jr. The trial court found that the Reids or their predecessors in title were responsible for the creation of the accreted land through artificial means, but neither Herndon and Weller nor their predecessors in title were responsible for the creation of the accreted land in front of their parcel. Because the Reids or their predecessors in title were responsible for the creation of the accreted land in front of their parcel through artificial means, the trial court awarded the artificially accreted land in front of their parcel to the State. On the other hand, because neither Hern-don and Weller nor their predecessors in title were responsible for the creation of the accreted land in front of their parcel, the trial court awarded them the accreted land in front of their parcel. The Reids appealed to the Alabama Supreme Court from the trial court’s award to the State of the land created by artificial accretion in front of the Reids’ parcel, and the Alabama Supreme Court affirmed that award.
 

 State v. Gill
 
 and
 
 Reid v. State
 
 stand for the proposition that a landowner
 
 *796
 
 has a right to land created in front of his or her land by artificial accretion that is superior to the right of the State if neither the landowner nor his or her predecessor in title is responsible for the artificial accretion of the land but has an inferior right to that of the State if the landowner or his or her predecessor in title is responsible for the artificial accretion. Thus,
 
 State v. Gill
 
 and
 
 Reid v. State
 
 have no application in the case now before us because they do not address the proper apportionment of naturally accreted land between coterminous landowners.
 

 Although we have not been cited to an Alabama case addressing the proper apportionment of naturally accreted land between coterminous landowners, the general rule governing such an apportionment “is to divide the new shoreline among the proprietors in proportion to their respective rights in the old shoreline, and to draw lines from the points of division thus made in the new shoreline to the points at which the old shoreline is intersected by the boundaries separating the proprietors.” 65 C.J.S.
 
 Navigable Waters
 
 § 98 (2000).
 

 In the case now before us, the trial court’s award of the entire triangle to the Spottswoods and determining that the Spottswood line was the correct location of the disputed segment of the boundary line was consistent with the general rule quoted above. The 1899 legal description of the lot now owned by the Reimers indicated that that lot had a bay frontage of 61.5 feet in 1899 while the 1967 description of the lot now owned by the Spottswoods indicated that that lot had a bay frontage of 56.58 feet in 1967. Dividing the new shoreline at the western terminus of the Spottswood line, as the trial court did, results in the Reimer lot having a bay frontage of 61.3 feet while the Spottswood lot has a bay frontage of 48.9 feet. On the other hand, dividing the new shoreline at the western terminus of the Reimer line, as the Reimers contend the trial court should have done, would result in the Reimer lot having a bay frontage of 89 feet while the Spottswood lot would have a bay frontage of 21.2 feet. Accordingly, we affirm the trial court’s judgment insofar as it determined that the Spottswoods were entitled to the triangle under the rule governing the apportionment of land created by natural accretion in front of the land of coterminous landowners and that, therefore, the Spottswood line was the correct location of the disputed segment of the upland boundary line.
 

 Because we affirm the trial court’s judgment insofar as it determined that the Spottswoods were entitled to the triangle under the rule governing the apportionment of land created by natural accretion in front of the land of coterminous landowners, we need not reach the issue whether the trial court erred in its alternative determination that the Spottswoods were entitled to the triangle because their predecessors in title had acquired it by adverse possession.
 

 The Spottswoods argue that the trial court erred in determining that the correct location of the riparian boundary line is an extension of the Spottswood line into Mobile Bay because, they say, it violates the general rule that riparian boundary lines should run perpendicular to the shoreline. On the other hand, the Reimers, although they concede that the general rule is that riparian boundaries should run perpendicular to the shoreline, argue that the general rule should not be applied in the case now before us because, they say, it would create an inequitable result because it would place the boundary line between the parties’ riparian rights south of a substantial portion of the Reimer pier, which has been in the same
 
 *797
 
 location since the 1950s. Neither the Spottswoods nor the Reimers have cited an Alabama case on point.
 

 “The apportionment of riparian rights, as between adjoining riparian owners, generally is made by extending lines from the ends of the side lines of the properties at right angles to the line of the water front, if the latter is straight or substantially so,
 
 subject to variation where the line of navigation is not parallel with the shoreline, without regard to the direction of the dividing lines of the upland parcels. However, the general rules for apportionment of riparian rights cannot be strictly applied where irregular shorelines are involved. Where the shore is decidedly convex or concave, riparian rights are apportioned ratably between the riparian owners, such as by drawing straight lines out to the line of navigability at such points as will divide the latter line proportionately to the several frontages on the shore, or by drawing a line perpendicular to a tangent drawn on a circular shore.”
 

 65 C.J.S.
 
 Navigable Waters
 
 § 84 (footnotes omitted) (emphasis added).
 

 In the case now before us, the bay frontage of the Reimer and Spottswood lots is substantially straight. Under the general rule, the boundary line separating the riparian rights appurtenant to the Spotts-wood lot from those appurtenant to the Reimer lot should run perpendicular to the shoreline. However, this case is complicated by the fact that natural accretion has substantially changed not only the distance between Scenic Highway 98 and the shoreline of Mobile Bay along the Reimer and Spottswood lots but also the bearing of the shoreline; the shoreline now runs in a more northwesterly bearing than it did in the 1950s. The Geo survey indicates that the Reimer pier, when it was originally built in the 1950s, was located south of a line running perpendicular to the shoreline from the western terminus of the upland boundary line between the Reimer lot and the lot now owned by the Spottswoods.
 

 Given the unique facts of the case now before us, we agree with the trial court’s determination that adhering to the general rule providing that riparian boundary lines run perpendicular to the shoreline in this particular case would be inequitable. Accordingly, we affirm the trial court’s judgment insofar as it determines that the riparian boundary line is an extension of the Spottswood line. However, we hasten to add that our holding is limited to the particular facts of this case.
 

 The Spottswoods also argue that the trial court erred in determining that the proposed Spottswood pier could be built only in the footprint of the Demouy pier. The Spottswoods argue that, subject to harbor and pier lines established by the United States or the State of Alabama, they can build a pier anywhere within the boundary lines of their riparian rights so long as it does not unreasonably obstruct navigation.
 

 In
 
 Ex parte Cove Properties, Inc.,
 
 796 So.2d 331 (Ala.2000), the supreme court stated:
 

 “The rights of riparian owners are stated in §§ 33-7-50 through 33-7-54, Ala.Code 1975. Section 33-7-50 states:
 

 “ ‘The owner of riparian lands upon navigable waters in the State of Alabama may install in front of their respective riparian lands wharves, docks, warehouses, sheds, tipples, chutes, elevators, conveyors and the like for receiving, discharging, storing, protecting, transferring, loading and unloading freight and commodities of commerce to and from vessels and carriers, and may use their riparian lands in connection therewith and
 
 *798
 
 dredge out and deepen the approaches thereto, and may charge and collect reasonable tolls for the use thereof. All such structures are to be subject to such lines and limitations as may at the time of making such improvements be laid or placed by any authority of the United States, or of the State of Alabama, who may have authority to control harbor and pier lines.’
 

 “This section governs building rights not only on riparian lands and the overlying waters but also on the lands and overlying waters, including navigable waters, in front of riparian lands. ‘The fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature in enacting the statute.’
 
 IMED Corp. v. Systems Eng’g Assocs. Corp.,
 
 602 So.2d 344, 346 (Ala. 1992). In interpreting a statute, ‘[wjords used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says.’
 
 Id. See also Ex parte Pfizer, Inc.,
 
 746 So.2d 960, 964 (Ala.1999);
 
 Blue Cross & Blue Shield v. Nielsen,
 
 714 So.2d 293, 296 (Ala.1998);
 
 Tuscaloosa County Comm’n v. Deputy Sheriffs’ Ass’n of Tuscaloosa County,
 
 589 So.2d 687, 689 (Ala.1991);
 
 Town of Loxley v. Rosinton Water, Sewer & Fire Protection Auth., Inc.,
 
 376 So.2d 705, 708 (Ala.1979). ‘If the language of [a] statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.’
 
 IMED Corp.,
 
 602 So.2d at 346.
 

 “The language of § 33-7-50 is plain and unambiguous. An owner of riparian lands may install a pier in navigable waters in front of its riparian lands, subject to harbor and pier lines established by the United States or the State of Alabama, and with the caveat that such a pier may not unreasonably obstruct navigation.
 
 § 33-7-51.”
 

 796 So.2d at 333-34 (emphasis altered).
 

 Insofar as the trial court’s judgment determined that the Spottswoods were restricted to building their proposed pier on the footprint of the Demouy pier, it violated § 33-7-50, Ala.Code 1975. Moreover, the trial court’s judgment did not articulate an equitable rationale justifying that restriction. Accordingly, we reverse the trial court’s judgment insofar as it determined that the Spottswoods were restricted to building their proposed pier in the footprint of the Demouy pier. In all other respects, we affirm the trial court’s judgment.
 

 APPEAL — AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
 

 CROSS APPEAL — AFFIRMED.
 

 THOMPSON, P.J., and PITTMAN and MOORE, JJ., concur.
 

 THOMAS, J., concurs in the result, without writing.
 

 
 *799
 
 [[Image here]]